# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KENNETH GREEN,          )
          )
          Plaintiff,     )
          )
     v.           )     Case No. 4:14cv0918 TCM
          )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
          )
        Defendant.   )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Kenneth Green's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties pursuant to 28 U.S.C. § 636(c).

## Procedural History

Kenneth Green (Plaintiff) applied for DIB and SSI in June 2011, alleging that he became disabled on June 15, 2010, because of depression, chronic obstructive pulmonary disease (COPD), high blood pressure, and high cholesterol. He was fifty-three years of age when he applied for benefits. (R.[1] at 119-25, 126-32, 153.) His applications were denied

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

initially and after a hearing before Administrative Law Judge (ALJ) Jhane Pappenfus. (Id. at 10-23, 28-50, 58, 60, 65-68.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby adopting her decision as the final decision of the Commissioner. (Id. at 1-5.)

Because the final decision is not supported by substantial evidence on the record as a whole, the decision of the Commissioner is reversed.

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Robin Cook testified at the administrative hearing.

Plaintiff testified that he lives alone in a recreational vehicle parked on his sister's property. He has three children. Plaintiff has a twelfth grade education and has received no other education or training. Plaintiff received worker's compensation in 1991 or 1992 and unemployment benefits in 2008 and 2009 during off-season periods in relation to seasonal work he was then performing. (Id. at 31-32, 42.)

Plaintiff explained that he stopped working because he could not keep up with the demands of the job given the pace of the work and the breathing difficulties he had in the hot and dusty environment.[2] He cannot return to his previous work as a truck driver because he would be unable to pass the required physical given his coughing spells resulting in lightheadedness and black outs. (Id. at 35-37.)

---

[2]Plaintiff's Work History Report lists a job as a truck driver in waste disposal from the 1980's to May 2009. From January to June 15, 2010, he worked in a factory through a temporary services agency. (Id. at 165.)

Plaintiff first noticed his breathing difficulties about five years ago when he could not sleep or would wake up coughing and not being able to breathe. His breathing has worsened within the past two or three years. He is currently unable to pick up an object and walk without needing to set it down because of coughing and gasping for air. Dust, heat, and bending over aggravate his breathing condition. He experiences intermittent episodes of shortness of breath and sometimes can walk only short distances before becoming short of breath. At other times, he can walk greater distances. Plaintiff regularly takes medication for his breathing condition and uses a rescue inhaler ten to fifteen times a day when he is short of breath. (Id. at 37-38.)

Plaintiff experiences shortness of breath doing any type of physical activity but also has coughing spells while sitting and watching television, which lead to shortness of breath. Plaintiff's coughing spells last a minute or two and occur up to twelve or fifteen times a day. He uses his emergency inhaler during such spells, but it takes three to seven minutes before the inhaler is effective. (Id. at 38.)

Also, Plaintiff has breathing problems and coughing spells at night, causing him to be tired and unable to function upon getting up in the morning. His doctor has provided him an oxygen/breathing machine to use at night. Plaintiff stopped smoking over one year ago; his breathing has improved some since. Plaintiff testified, however, that his doctor has advised him that his breathing condition will worsen over time. (Id. at 38-40.)

Plaintiff experiences depression and previously reached a point where he "just didn't care." (Id. at 40.) Plaintiff usually feels that way when he is alone because he thinks about what has happened and what is going to happen and then gives up and does not want to do

anything.  He used to be social when he was working but is currently "into . . . being by [him]self."  (Id.)  Plaintiff is more content when he is alone.  (Id. at 40-41.)

Asked about his exertional abilities, Plaintiff testified that he can walk approximately 100 to 150 feet and then must sit for twenty to thirty minutes.  He can comfortably lift forty-five pounds without getting short of breath but cannot do it constantly throughout the day.  (Id. at 41-42.)

Asked about his daily activities, Plaintiff testified that he listens to the radio and goes for walks outside until he is unable to breathe.  He then sits for a while before walking back home.  Plaintiff associates with his sister and her husband.  He plays very little with his grandchildren and his sister's grandchildren; they must leave him alone after about ten minutes because he is unable to breathe.  (Id.)  He used to enjoy hunting, fishing, and hiking but had to stop when his breathing problem worsened.  Plaintiff can no longer walk to the fishing hole, but he can fish if he can ride there and then sit.  He no longer drinks alcohol and last drank to excess in July 2010.  Plaintiff does not consider having one or two beers to be heavy drinking.  (Id. at 41, 43-44.)

Asked to classify Plaintiff's past work, Robin Cook, a vocational expert, described his past work as a factory worker/laborer, factory worker/molding machine operator, and concrete mixing truck driver as medium and semiskilled; his work as a roll-off truck operator was medium to heavy and semiskilled.  (Id. at 46.)

The ALJ asked Ms. Cook to consider Plaintiff to be limited to medium work and to further assume that Plaintiff should avoid fumes, odors, dust, gases, and extremes in humidity. Plaintiff's mental impairment limited him to unskilled work.  Ms. Cook testified that Plaintiff

would be unable to perform any of his past relevant work but could perform other medium work such as dining room attendant. Also, he could perform light work such as office helper and sewing machine operator. (Id. at 46-47.)

Plaintiff's counsel asked Ms. Cook to assume the person described by the ALJ to be further limited to standing and walking for four hours in an eight-hour workday. She responded that such a person could continue to perform work as a sewing machine operator. The job of sewing machine operator would also remain available to a person limited to two hours of standing and walking. (Id. at 48.) Counsel then asked Ms. Cook to consider a person who would need to sit and take a break at unpredictable times, whereupon he would be off task for five minutes an hour. Ms. Cook responded that the job base she previously described would not be available. (Id. at 48-49.)

## **Medical Records Before the ALJ**

The medical records before the ALJ are summarized below in chronological order beginning with those of Plaintiff's admission to the Phelps County Regional Medical Center in July 2010 after he made suicidal statements to his ex-wife and, in response to her 911 call, had taken by the Crawford County sheriff's department to a jail facility where he remained on suicide watch for seven days because there were no psychiatric beds available. Plaintiff was then fifty-two years of age. At the medical center, Plaintiff reported to Dr. Zulfikar Rasool Vali that he had feelings of depression for the past ten years but that his depression had recently worsened. Plaintiff had not sought psychiatric help in the past. Plaintiff reported that he currently felt sad, had difficulty concentrating and sleeping, and was worried about finances. He had lost his job in January because of an offense of driving while intoxicated

(DWI). Plaintiff further reported that his alcohol consumption had increased over the years but that alcohol was not a problem for him. Also, he had used drugs between the ages of thirteen and twenty-two. Plaintiff described always feeling dead but he did not want to do anything to harm himself. He denied any psychotic or manic symptoms. Dr. Vali noted that Plaintiff was disheveled in appearance. Dr. Vali further noted no involuntary movements. On examination, Plaintiff was oriented to time, place, and person; his eye contact was poor; his affect was constricted; his insight and judgment seemed partial. Plaintiff described his mood as "sucks." No delusions or hallucinations were reported. Plaintiff denied any suicidal thoughts or plans but reported that he had a wish to be dead. He was tearful at one point during the evaluation. Plaintiff was diagnosed with alcohol dependence and polysubstance abuse versus dependence by history. Mood disorder secondary to chronic substance use, recurrent major depressive disorder, and dysthymia were to be ruled out. Plaintiff was assigned a Global Assessment of Functioning (GAF) score of 25.[3] (Id. at 220-22.)

During his stay at the medical center, Plaintiff was given Celexa and began an assessment for alcohol withdrawal. Dr. Vali recommended that Plaintiff participate in inpatient rehabilitation at the Salem Treatment Center, but because of Plaintiff's uncertainty regarding continuing inpatient care, he was discharged from the medical center six days after

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 21 and 30 is indicates behavior considerately influenced by delusions or hallucinations; or serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation); or inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends). DSM-IV-TR at 34.

admission. On discharge, Plaintiff was oriented to time, place, and person; was conscious and alert; had good eye contact; had a constricted affect; had partial insight and judgment; and was partly cooperative. Psychomotor agitation, but no involuntary movements, were noted. Plaintiff reported that his mood was okay. His diagnoses were unchanged. Dr. Vali assigned him a GAF score of 50.[4] (Id. at 223-24.)

In September, Robert Cottone, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) after reviewing Plaintiff's July 2010 mental health records and his reported activities of daily living. Dr. Cottone opined that Plaintiff's affective disorder and alcohol and polysubstance abuse caused moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Id. at 234-45.)

In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. Cottone opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions, but was not significantly limited in his abilities regarding very short and simple instructions, including his ability to make simple work-related decisions. Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without

---

[4] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

an unreasonable number and length of rest periods, to sustain an ordinary routine without special supervision, and to work in coordination or proximity to others without being distracted by them. Dr. Cottone opined that Plaintiff was not significantly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. As to Plaintiff's ability to interact socially, Dr. Cottone opined that Plaintiff was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Plaintiff was not significantly limited in his abilities to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Finally, Dr. Cottone opined that Plaintiff had no significant limitations in his ability to adapt, that is, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Id. at 246-48.) Dr. Cottone concluded that Plaintiff "must avoid work involving intense or extensive personal interaction, handling complaints or dissatisfied customers, close proximity to coworkers, close proximity to available controlled substances, multi-step instructions, multi-tasking activities, and public contact." (Id. at 248.)

In November, Plaintiff underwent a consultative psychological evaluation for purposes of determining his eligibility for Medicaid coverage. Plaintiff reported to Thomas J. Spencer, Psy.D., that he has thoughts of suicide every day and does not want to wake up. He has wanted to die for a long time but did not want to kill himself; he wanted someone else to do

it for him.  He had called his ex-wife in July and asked her to shoot him, after which he was

taken to jail and then hospitalized.  He had taken Celexa and trazodone after discharge but

had been without medication for nearly two months due to a lack of insurance.  And, he had

no financial means to afford follow-up care.  Dr. Spencer noted that Plaintiff was homeless

and living in a tent on his sister's property.  Plaintiff reported feeling hopeless and helpless

and sleeping poorly at night.  He was depressed most of the time.  His attention and

concentration were poor.  Although reporting feeling antsy and restless, Plaintiff also reported

that he lacked energy and motivation most days and spent his days lying around and watching

television.  His bad days outnumbered his good days.  Dr. Spencer described Plaintiff as

currently being irritable.  Plaintiff denied any past or present drug or alcohol abuse.  On

examination, Plaintiff was cooperative; his eye contact was fair; his motor behavior was

delayed; his speech was variable; his mood was "iffy"; his affect was irritable and sullen; his

flow of thought was intact and relevant; his insight and judgment were questionable; his

immediate and remote memory were adequate.  There was no evidence of hallucinations or

delusions.  He was oriented to time, place, person, and situation.  Plaintiff made limited errors

during an assessment for attention and concentration.  Upon conclusion of the evaluation, Dr.

Spencer diagnosed Plaintiff with major depressive disorder, recurrent, moderate to severe, and

anxiety disorder, not otherwise specified.  Plaintiff was assigned a GAF score of 50-55.[5]  Dr.

Spencer opined that Plaintiff has a mental illness that interferes with his ability to engage in

---

[5]A GAF score between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and
circumstantial speech, occasional panic attacks); or moderate difficulty in social, occupational, or
school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.

employment suitable for his age, training, experience, and education. Dr. Spencer further opined that Plaintiff's disability could exceed twelve months but that his prognosis would likely improve with treatment and compliance. (Id. at 251-54.)

In February 2011, Plaintiff went to the Medical Clinic of Owensville (Medical Clinic) for a checkup and complaints of insomnia, coughing with mucus production, and constant pain. Plaintiff reported that he sometimes coughs so forcefully he feels about to pass out. It was questioned whether Plaintiff had mild COPD, and laboratory and diagnostic testing was ordered. Plaintiff was prescribed Lisinopril for hypertension, Claritin and prednisone for allergies, and Naproxen for arthritis. (Id. at 269.) Chest x-rays showed no active disease. (Id. at 257.)

Ten days later, Plaintiff returned to the Medical Clinic for follow up. Plaintiff reported that he needed to have his "cough gone." Plaintiff was prescribed a Z-pack for upper respiratory infection, and Medrol dose pack and Ventolin for mild COPD. Pulmonary function tests were ordered. (Id. at 268.)

Plaintiff followed up at the Medical Clinic on March 29, complaining of shortness of breath, mainly at night. Plaintiff reported that he was using his inhaler. He thought he was still ill inasmuch as he experienced fever and sweats. Plaintiff was diagnosed with chronic bronchitis and was prescribed an antibiotic. He was also prescribed Symbicort and Ventolin for mild COPD. (Id. at 267.)

Spirometry testing performed the following day showed Plaintiff to have moderately severe airway obstruction, consistent with moderate COPD as characterized by worsening

airflow limitation with shortness of breath typically developing on exertion, and occasional cough and sputum production.  (Id. at 260-61.)

On April 6, Plaintiff was seen at the Medical Clinic, prescribed Advair for mild COPD, and instructed to continue with Ventolin and to stop smoking.  (Id. at 266.)

In August, Barbara Markway, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form, opining that Plaintiff's moderate major depressive disorder-recurrent, anxiety disorder, history of polysubstance abuse, and continued use of alcohol caused moderate restrictions in Plaintiff's activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; mild difficulties in maintaining social functioning; and no repeated episodes of decompensation of extended duration.  (Id. at 275-86.)  In a Mental RFC Assessment completed that same date, Dr. Markway opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, but was not significantly limited in his abilities regarding very short and simple instructions, including his ability to make simple work-related decisions.  Dr. Markway further opined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods but had no significant limitations in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  As to Plaintiff's ability for social interaction, Dr. Markway

opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public but otherwise was not significantly limited. Finally, Dr. Markway opined that Plaintiff experienced no significant limitations in adaptation. In conclusion, Dr. Markway opined that Plaintiff "retains the ability to learn, remember, and perform simple to slightly more complex tasks. He can attend and persist consistently on simple tasks. He can interact appropriately with co-workers and supervisors. He can adapt to customary changes with a work setting." (Id. at 272-74.)

Two weeks later, Plaintiff returned to the Medical Clinic for complaints of shortness of breath with exertion. Plaintiff denied any chest pain or edema. Examination of the lungs showed no wheezing or crackles. Plaintiff was prescribed Decadron and prednisone for COPD, and was instructed to increase his use of Advair and continue with Ventolin. Overnight oximetry testing was ordered. (Id. at 291.)

At a follow-up visit nine days later, on August 26, Plaintiff reported that he had quit smoking, was using his medication as prescribed, and was using a bilevel positive airway pressure (BiPAP) machine. He felt his COPD was better controlled. Plaintiff was instructed to continue with Advair and Ventolin and to finish his steroid medication. Plaintiff was also instructed to continue using the BiPAP machine for his sleep apnea. (Id. at 290.)

In January 2012, Plaintiff returned to the Medical Clinic, reporting shortness of breath and a cough. Examination showed trace expiratory wheeze. Plaintiff was diagnosed with COPD exacerbation and was prescribed prednisone. An injection of Decadron and Kenalog was administered. (Id. at 289.)

One month later, Plaintiff complained to the providers at the Medical Clinic that he experienced chest tightness and shortness of breath again with minimal exertion. Plaintiff reported having a frequent cough that produced clear mucus. Plaintiff was diagnosed with COPD exacerbation and was administered a Decadron/Kenalog injection. Prednisone and Cipro were prescribed, and Plaintiff was instructed to continue with Advair. He was referred to the Pulmonology Clinic. (Id. at 288.)

Plaintiff was seen at the Pulmonology Clinic on February 23 for evaluation of his complaints of shortness of breath. Plaintiff also reported having a chronic cough with production. Physical examination was essentially unremarkable. Pulmonary/chest examination showed wheezing but no respiratory distress. Dr. Umer Hafeez Siddiqui instructed Plaintiff to continue with Advair and Albuterol. Spiriva was added to his medication regimen. He was to return in two weeks. (Id. at 301-04.)

Chest x-rays taken four days later showed Plaintiff's lungs were hyperinflated, consistent with emphysematous lung changes. No acute processes were otherwise noted. (Id. at 320.)

Plaintiff returned to Dr. Siddiqui on March 8, reporting some improvement in his condition and that he was currently doing well. Plaintiff continued to complain of cough but experienced no shortness of breath. Dr. Siddiqui noted that pulmonary function tests showed moderately severe obstruction but with bronchodilator improvement. Physical examination was unremarkable in all respects. A pulmonary examination was normal. The possibility of beginning treatment with Isoniazid (INH) for latent tuberculosis (TB) was discussed, but Plaintiff reported a history of hepatitis and did not feel that he would avoid alcohol use. Dr.

Siddiqui instructed Plaintiff to continue on his current medications and to return in three months. (Id. at 298-301, 317.)

When Plaintiff returned, in May, Dr. Siddiqui noted that Plaintiff had begun treatment with INH on March 22 for latent TB. Plaintiff complained of shortness of breath, but experienced no coughing or wheezing. Physical examination was normal in all respects. Dr. Siddiqui described Plaintiff as doing well with his medication. Plaintiff was continued with his treatment plan and was instructed to return in three months. (Id. at 295-98.)

Plaintiff visited Dr. Siddiqui in August 10, complaining of increased shortness of breath but not of cough or fatigue. Dr. Siddiqui noted that Plaintiff's INH treatment had been stopped because of elevated liver function tests. Physical examination was normal in all respects. Dr. Siddiqui prescribed Doxycycline for COPD exacerbation and instructed Plaintiff to return in three months. (Id. at 293-95.) Chest x-rays taken that same date showed hyperinflation of the lungs but no consolidation or effusion. (Id. at 310.)

When next seeing Dr. Siddiqui, in November, Plaintiff reported that he had had an increase in cough and shortness of breath. Plaintiff exhibited wheezing when examined. Plaintiff was prescribed prednisone and Levaquin for COPD exacerbation and was instructed to return in three months. (Id. at 306-08.)

### The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2015. The ALJ further found that Plaintiff had not engaged in substantial gainful activity since June 15, 2010, the alleged onset date of disability. The ALJ determined that Plaintiff has severe impairments of COPD and depression, but did not have an

impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Id. at 15-16.)

The ALJ found that Plaintiff had the RFC to perform medium work

> except that he can lift and carry 50 pounds occasionally and 25 pounds frequently. He can stand and walk a total of six hours each out of an eight-hour workday. He can sit a total of six hours out of an eight-hour workday. He must avoid exposure to fumes, dusts, odors, gases and extremes in humidity. He can understand, remember, and carry out at least simple instructions and non-detailed tasks.

(Id. at 17.) With this RFC, Plaintiff was unable able to perform his past relevant work. With this RFC and his age, education, work experience, Plaintiff could perform other work as it exists in significant numbers in the national economy – specifically, office helper, dining room attendant, and sewing machine operator. The ALJ thus found Plaintiff was not disabled from June 15, 2010, through the date of her decision. (Id. at 21-23.)

### Discussion

To be eligible for DIB and SSI under the Social Security Act, Plaintiff must prove that he is disabled. **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings." **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The Plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the Plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. **Anderson v. Astrue**, 696 F.3d 790, 793 (8th Cir.

2012). The decision may not be reversed merely because substantial evidence could also support a contrary outcome. **Young v. Apfel**, 221 F.3d 1065, 1068 (8th Cir. 2000).

Plaintiff challenges the manner and method by which the ALJ determined his RFC – specifically, the weight accorded to Plaintiff's credibility and to the opinion evidence of record – as well as to the ALJ's failure to provide support for her RFC findings. Because it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole, the decision must be reversed and the matter remanded to the Commissioner for further proceedings.

A claimant's RFC is the most he can do despite his physical or mental limitations. **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005); **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Eichelberger**, 390 F.3d at 591; **Hutsell v. Massanari**, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. **Hutsell**, 259 F.3d at 712 (internal quotation marks and

citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. **Id.**

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. **Polaski v. Heckler**, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). An ALJ may not discredit a claimant's subjective complaints solely because they are unsupported by objective medical evidence. **Id**.; see also **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. **Id.**; **Cline v. Sullivan**, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." **Cline**, 939 F.2d at 565; see also **Renstrom**, 680 F.3d at 1066; **Beckley v. Apfel**, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. **Hogan v. Apfel**, 239 F.3d 958, 962 (8th Cir. 2001); see also **Casey v. Astrue**, 503 F.3d 687, 696 (8th Cir. 2007).

The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. **Tellez**, 403 F.3d at 957; **Pearsall**, 274 F.3d at 1218.

Here, the ALJ cited inconsistencies in the record when finding Plaintiff's subjective complaints are not credible. First, the ALJ noted that the objective medical evidence of record failed to support the severity of symptoms as reported by Plaintiff. Specifically, the ALJ summarized evidence of Plaintiff's mental health examinations and treatment from July to November 2010 and found such evidence did not document significant limitations of mental functioning that would last twelve months in duration despite treatment. Additionally, the ALJ referred to evidence of Plaintiff's treatment in 2011 and 2012 for COPD and noted that, despite the intermittent nature of treatment, Plaintiff did not exhibit frequent exacerbations, prolonged symptomatic episodes despite treatment, or associated symptoms of breathing difficulties such as weakness or other physical abnormalities. Indeed, the medical record shows Plaintiff to consistently have had essentially normal physical examinations. The absence of objective medical evidence to support a claimant's allegations of disabling symptoms is one factor that the ALJ is required to consider in determining a claimant's credibility. **Barrett v. Shalala**, 38 F.3d 1019, 1023 (8th Cir. 1994). Although Plaintiff argues that the ALJ improperly relied solely on the absence of objective medical evidence to find his complaints not credible, a review of the ALJ's credibility determination belies this contention.

In addition to the lack of supporting objective medical evidence, the ALJ also noted that Plaintiff's symptoms were controllable with treatment and that Plaintiff experienced no side effects from his treatment or medications. With respect to Plaintiff's COPD, the record

supports this determination. Impairments that are controllable or amenable to treatment do not support a finding of disability. See **Roth v. Shalala**, 45 F.3d 279, 282 (8th Cir. 1995). And, the ALJ noted the intermittent nature of Plaintiff's treatment, which itself detracts from a claimant's subjective complaints that his symptoms are disabling. See **Ostronski v. Chater**, 94 F.3d 413, 419 (8th Cir. 1996) (infrequent medical treatment during relevant period suggest that symptoms not so great as to preclude the performance of work). While the ALJ noted that Plaintiff had reported a financial inability to obtain treatment, she found the record showed that Plaintiff was never denied treatment for any reason nor sought aid from any public or private institution or program to defray the cost of treatment. Where there is no evidence that a claimant was ever denied medical treatment due to financial reasons, the ALJ may consider the failure to seek regular treatment in determining the claimant's credibility. See **Whitman v. Colvin**, 762 F.3d 701, 706-07 (8th Cir. 2014); **Goff**, 421 F.3d at 793. Plaintiff argues, however, that the ALJ's finding that Plaintiff never sought aid from any financial assistance program is erroneous given Plaintiff's application for and eventual receipt of Medicaid. While the ALJ may have misstated this circumstance, the fact that Plaintiff ultimately received program assistance for medical care does not detract from the ALJ's credibility determination; indeed, it bolsters it. The record shows that even after receiving Medicaid benefits, Plaintiff sought only intermittent treatment for his COPD and no treatment for his mental condition. The ALJ did not err in considering the intermittent nature of Plaintiff's treatment as a factor discounting his credibility.

Plaintiff also contends that the ALJ erred by relying on his receipt of worker's compensation and unemployment benefits to discount his complaints of disabling symptoms.

Plaintiff's argument is well taken. Although accepting unemployment benefits entails an assertion of an ability to work and is inconsistent with a claim of disability, **Cox v. Apfel**, 160 F.3d 1203, 1208 (8th Cir. 1998), a review of the record here shows Plaintiff's receipt of such benefits, as well as his receipt of worker's compensation, occurred prior to his alleged onset of disability. Indeed, Plaintiff's receipt of worker's compensation occurred nearly twenty years before the alleged onset. As such, it cannot be said that Plaintiff's acceptance of unemployment benefits or worker's compensation prior to the time he claimed he was disabled is inconsistent with subsequent complaints of symptoms giving rise to disability. Cf. **Barrett v. Shalala**, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement made for unemployment benefits that claimant is capable of working inconsistent with claim of disability *during same period*). Although the ALJ indicates that Plaintiff's receipt of these benefits and "privileges" as well as his status as a "repeat filer"[6] demonstrates an appearance of financial motivation to obtain secondary gain, the Eighth Circuit has recognized that "all disability claimants are financially motivated to some extent." **Ramirez v. Barnhart**, 292 F.3d 576, 581 n.4 (8th Cir. 2002). The ALJ's suggestion that Plaintiff's remote and unrelated history of receiving unemployment and worker's compensation benefits demonstrates a motivation to seek disability benefits for secondary gain finds no support in the record. This is especially evident given the ALJ's

---

[6]The ALJ stated in her decision that Plaintiff previously filed applications for DIB and SSI in July 2010 which were not further pursued after their denial in September 2010. (R. at 13.) The only record referencing these prior applications included in the current administrative record is a September 2010 "Explanation of Determination" from a disability examiner recommending a denial of those applications.

subsequent finding that Plaintiff had a steady earnings history.[7] Cf. **O'Donnell v. Barnhart**, 318 F.3d 811, 817 (8th Cir. 2003).

Plaintiff also complains that the ALJ discounted his credibility in part on an erroneous finding that Plaintiff repeatedly failed to comply with medication and treatment recommendations. (See R. at 20.) Again, Plaintiff's argument is well taken. Although the ALJ made this general finding, she does not refer to any record evidence to support it. The undersigned notes that the ALJ's summary of the medical evidence includes a reference to Plaintiff's delayed cessation of smoking despite being instructed earlier to stop. Given the addictive nature of smoking, however, ALJs are cautioned against relying on a claimant's immediate inability to stop smoking to support a finding that subjective complaints of respiratory symptoms are not credible. See **Shramek v. Apfel**, 226 F.3d 809, 812-13 (7th Cir. 2000); cf. **Gabbert v. Colvin**, No. 4:12CV596 NCC, 2014 WL 1725832, at *20-21 (E.D. Mo. Apr. 30, 2014). The ALJ's medical summary also refers to Plaintiff's failure to take medication or seek follow up care upon his psychiatric discharge in July 2010. Plaintiff's reported financial inability to seek such care at that time is addressed above; moreover, there is no indication that Plaintiff failed to comply with treatment recommendations or a medication regimen thereafter. No further medication or treatment recommendation was provided to Plaintiff for his mental condition, and the record shows Plaintiff complied in all respects with his treatment regimen for his COPD. The ALJ's finding, therefore, that Plaintiff repeatedly failed to comply with treatment recommendations is not supported by the record.

---

[7] A review of Plaintiff's earnings record shows that he earned an average of approximately $22,800.00 per annum from 1991 through 2009. (See R. at 133.)

The ALJ also determined that Plaintiff's complaints of limited daily activities were not credible, stating only that "[f]or the many reasons and factors that the claimant's allegations of disability are found not credible, so too are the claimant's allegations of severely limited daily activities found not credible." (R. at 21.) Other than this general statement, the ALJ does not discuss or address any of Plaintiff's daily activities or the extent to which such activities themselves are inconsistent with Plaintiff's subjective complaints. This is error. See **Cline**, 939 F.2d at 566; cf. **Rainey v. Department of Health & Human Servs.**, 48 F.3d 292, 293 (8th Cir. 1995) (ALJ did not indicate how claimant's activities were inconsistent with his allegations of disabling symptoms).

Accordingly, although the ALJ's credibility determination has some support in the record, her improper, incomplete, and inaccurate consideration of other factors weakens her overall conclusion that the record undermined Plaintiff's credibility. See generally **Baumgarten v. Chater**, 75 F.3d 366 (8th Cir. 1996). The matter must therefore be remanded for an appropriate analysis of Plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*.

The ALJ also erred in her treatment of the opinion evidence in this case. When evaluating opinion evidence, an ALJ must explain in her decision the weight given to any opinions from treating sources, nontreating sources and nonexamining sources. See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). By explaining the weight given to such medical source opinions, an ALJ both complies with the Regulations and assists the Court in its review of the decision. See **Willcockson v. Astrue**, 540 F.3d 878, 880 (8th Cir. 2008). Further, Social Security Ruling 96-6p dictates that "[f]indings of fact made by State agency

medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the [ALJ] . . . level[] of administrative review." SSR 96-6p, 1996 WL 362203, at *34467 (Soc. Sec. Admin. July 2, 1996). Accordingly, "the [ALJ] . . . must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists." Id. at *34468. "Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant[.]" 20 C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii). In circumstances where a medical source opinion may affect the outcome of a case, substantial evidence does not support an ALJ's adverse decision if it cannot be determined what, if any, weight the ALJ afforded the opinion. **McCadney v. Astrue**, 519 F.3d 764, 767 (8th Cir. 2008); see also **Woods v. Astrue**, 780 F. Supp. 2d 904, 913-14 (E.D. Mo. 2011).

The record before the ALJ includes the opinion of Dr. Cottone, a State agency psychological consultant, that Plaintiff had moderate restrictions in activities of daily living as well as moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. Dr. Cottone indicated specific circumstances wherein he believed Plaintiff would experience these limitations and concluded that Plaintiff "must avoid work involving intense or extensive personal interaction, handling complaints or dissatisfied customers, close proximity to coworkers, . . . and public contact." In August 2011, Dr. Markway, also a State agency psychological consultant, opined, as did Dr. Cottone, that

Plaintiff experienced moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace. Indicating specific circumstances of limitations, Dr. Markway opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public but could interact appropriately with co-workers and supervisors. The ALJ's decision is devoid of any reference to these State agency opinions and thus, on its face, runs afoul of the dictates of SSR 96-6p and of the Regulations.

Both Dr. Cottone and Dr. Markway describe functional limitations more restrictive than those determined by the ALJ. Indeed, both opinions describe limitations in Plaintiff's ability to interact socially, whether with the general public, coworkers, or supervisors. The ALJ's analysis as to Plaintiff's RFC, however, contains no mention of any such limitations – not even to discredit any evidence or opinions relevant thereto. Because the extent to which the ALJ may credit or discredit Dr. Cottone's and Dr. Markway's opinions may affect the outcome of this case, the ALJ's failure to address these opinions and explain the weight given to them renders her decision of non-disability unsupported by substantial evidence. The "primary difficulty is not with the possibility that the ALJ discounted [the] opinion[;] . . . the problem with the ALJ's opinion is that it is unclear whether the ALJ *did* discount [the] opinion, and, if it did so, why." **McCadney**, 519 F.3d at 767 (internal citation omitted).

The Commissioner argues that the ALJ did not err in failing to consider Dr. Cottone's opinion inasmuch as it was rendered prior to Plaintiff's current applications for benefits. This argument is without merit. The Commissioner is charged with the duty to review evidence about a claimant's medical impairment(s) that is material to a determination of whether the

claimant is disabled during the period of alleged disability.  See 20 C.F.R. §§ 404.1512, 416.912.  Such evidence includes opinions of State agency consultants and is material if it relates to the period under review by the ALJ.  20 C.F.R. §§ 404.1512(b), 416.912(b); cf. **Bergmann v. Apfel**, 207 F.3d 1065, 1070 (8th Cir. 2000).  The mere timing of a medical opinion is not dispositive of whether it is material to the Commissioner's disability determination.  **Williams v. Sullivan**, 905 F.2d 214, 216 (8th Cir. 1990).

Plaintiff's alleged onset date of disability is June 15, 2010.  As such, it cannot be said that Dr. Cottone's September 2010 opinion that addresses evidence of Plaintiff's mental impairment since July 2010 is not relevant or material to the Commissioner's determination of disability.  Additionally, the Regulations require that the Commissioner consider a claimant's medical history for at least the twelve-month-period preceding the month in which the claimant's application for benefits is filed.  20 C.F.R. §§ 404.1512(d), 416.912(d). Inasmuch as Plaintiff's applications for benefits were filed in June 2011, Dr. Cottone's September 2010 opinion falls well within this twelve-month window.

The Commissioner offers no justification for the ALJ's failure to address Dr. Markway's August 2011 opinion.

Plaintiff's challenge to the ALJ's treatment of Dr. Spencer's November 2010 opinion is also well taken.  In her written decision, the ALJ accorded little weight to Dr. Spencer's opinion that Plaintiff's mental impairment interfered with his ability to engage in employment, finding this opinion to be based on only a one-time examination and to be inconsistent with his objective medical findings that "indicated no deficits in cognition, thought process, speech, or psychomotor activity." (R. at 18.)  Contrary to the ALJ's statement, however, Dr.

Spencer objectively observed several deficits in Plaintiff's functioning, including that Plaintiff's motor behavior was delayed, his speech was variable, his mood and affect were irritable and sullen, and his insight and judgment were questionable. An inaccurate assessment of the evidence can serve as a basis for remand. **Draper v. Barnhart**, 425 F.3d 1127, 1130 (8th Cir. 2005). Such misapprehension of Dr. Spencer's findings, coupled with the ALJ's failure to acknowledge other opinion evidence of record, creates uncertainty and casts doubt upon the ALJ's rationale for denying Plaintiff's claims. See **Willcockson**, 540 F.3d at 879-80. Because it cannot be determined from the ALJ's decision whether she properly reviewed the evidence of record, the matter must be remanded. **Id.**

Finally, Plaintiff contends that the ALJ failed to articulate any support for her findings as to Plaintiff's physical RFC. An ALJ's RFC assessment must discuss and describe how the evidence supports each conclusion and must cite specific medical facts and nonmedical evidence in doing so, as well as resolve any material inconsistencies or ambiguities in the evidence of record. SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). The ALJ failed to engage in this process here. Instead, a review of the ALJ's RFC analysis shows it to consist only of discrediting Plaintiff's subjective complaints as well as a recitation of what the medical evidence did not show with respect to Plaintiff's physical impairments. The ALJ engaged in no discussion or analysis of any evidence as it related to what Plaintiff is able to do despite his impairments. In the absence of any thoughtful discussion or analysis by the ALJ, this Court would be required to weigh the evidence in the first instance or review the factual record de novo in order to find the ALJ's RFC assessment to be supported by

substantial evidence on the record as a whole. This the Court cannot do. See **Naber v. Shalala**, 22 F.3d 186, 188 (8th Cir. 1994).

### Conclusion

Because "[s]ubjective complaints . . . are often central to a determination of a claimant's RFC," **Fredrickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004), an ALJ's RFC assessment based on a faulty credibility determination is called into question when it does not include all of the claimant's limitations. See **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001). Additionally, where an ALJ fails to properly consider opinion evidence of record, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. **Id.**

In the instant case, the ALJ failed to properly evaluate Plaintiff's credibility and failed to properly analyze the medical evidence of record in this cause, resulting in an RFC determination that was not supported by substantial evidence on the record as a whole. The matter will therefore be remanded for further consideration. Although the undersigned is aware that the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of July, 2015.